UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROBERT COSTAN,                                    :

                Petitioner,          :          **MEMORANDUM DECISION**

           - v -                            :          1:23-cv-00069-DC

MARK MILLER,                                      :

                Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:          ROBERT COSTAN
                      Petitioner *Pro Se*
                      DIN 14-A-1677
                      Green Haven Correctional Facility
                      Stormville, NY 12582

                      ERIC GONZALEZ, Esq.
                      Kings County District Attorney
                      By:    Sholom J. Twersky, Esq.
                             Leonard Joblove, Esq.
                             Assistant District Attorneys
                      350 Jay Street
                      Brooklyn, NY 11201-2908
                             Attorney for Respondent

CHIN, *Circuit Judge*:

        On March 13, 2014, following a jury trial, petitioner Robert Costan was

convicted in the Supreme Court of New York, Kings County (Riviezzo, *J.*) of nine

counts of robbery in the first degree, one count of attempted robbery in the first degree,

one count of robbery in the third degree, one count of attempted robbery in the third degree, and two counts of criminal possession of a forged instrument. Dkt. 6-7 at 118-24. He was sentenced to an aggregate term of sixty-eight years' imprisonment. *Id.* at 149-51.

Following further proceedings on appeal in the Appellate Division, Second Department, and on remand in the Kings County Supreme Court, the judgment was modified as the conviction on one count of robbery in the first degree was reduced to robbery in the third degree, the convictions for criminal possession of a forged instrument were vacated, and the sentence was reduced to a total term of twenty-four years, with the matter remitted for sentencing on the third-degree robbery conviction. *People v. Costan*, 152 N.Y.S. 3d 162, 170-71 (2d Dep't 2021) ("*Costan II*"). The Court of Appeals denied leave to appeal. *See People v. Costan*, 37 N.Y.3d 1095 (2021) (Singas, *J.*) ("*Costan III*"). On December 6, 2021, Costan was resentenced by the Kings County Supreme Court on the new third-degree robbery conviction to a concurrent term of two to four years' imprisonment. *See* Dkt. 33 at 6.

On January 3, 2023, proceeding *pro se*, Costan filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the Eastern District of New York (the "Petition"). Dkt. 1. Respondent, represented by the Kings County District Attorney's Office, filed his opposition to the Petition on March 31, 2023. Dkt. 6. While the Petition was pending, Costan moved *pro se* in the Kings County Supreme Court to vacate his

2

judgment of conviction under CPL § 440.10 and to set aside his sentence under CPL

§ 440.20.  *See* Dkt. 33.  On April 22, 2024, the Kings County Supreme Court (Chu, *J.*)

denied both motions.  *Id.* at 3-9.  Costan did not seek leave to appeal that decision.  *See*

Dkt. 39.

On September 18, 2024, the case was reassigned to the undersigned.  For

the reasons that follow, the Petition is DENIED.

*STATEMENT OF THE CASE*

**I.**    ***The Facts***

The evidence at the trial and *de novo* suppression hearing established the

following:[1]

**A.**    ***The Robberies***

Between October 17 and November 20 of 2012, Robert Costan committed

twelve robberies against five commercial establishments in South Brooklyn

-- Tasti D-Lite, Happy Cleaners, Apple Laundry, and two separate Subway sandwich

shops on Atlantic Avenue and Fulton Street.  Dkt. 6-9 at 5.  The robberies followed a

similar pattern: Costan entered the store, brandished a gun or made statements and

gestures that indicated he was armed, demanded cash from the cash register, and

---

[1]    The facts are primarily drawn from Respondent's briefs submitted in opposition to Costan's direct appeal in the Appellate Division in 2018.  *See generally* Dkt. 6-9; 6-12.  The recitation of facts set forth in the state appellate briefs are supported by detailed citations to the record, including the transcript of the suppression hearing, trial, and subsequent sentencing.

handed the employee a bag to put the cash into. *Id.; see also id.* at 14-21. Costan took

between $100 and $800 from each of the completed robberies. *Id.* at 14-23. Costan

robbed some of these establishments as many as three times. *Id.* at 9.

    **B.**   *Investigation and Arrest*

    Detective William Schierle, an investigator with the Brooklyn Robbery

Squad ("BRS"), was responsible for investigating the string of robberies. Dkt. 6-5 at 151,

153-54. Schierle interviewed complainants and reviewed video surveillance from the

incident locations. Dkt. 6-5 at 154-57. He also used still images from the video

surveillance to create "Wanted" posters that offered a reward. Dkt. 6-11 at 112-113.

    On November 21, an anonymous tip was received regarding a male

named Robert Costan, who was approximately 50 years old. Dkt. 6-5 at 167. Upon

receipt of the tip, Schierle conducted a computer check and obtained a photo of Costan

and a possible address. *Id.* at 168-69. The next day, on November 22, Schierle

conducted a photo array identification procedure with Damarr Busby, one of the

employees at Tasti D-Lite who was present during the robberies that took place on

October 17, October 23, and October 4, 2012. Dkt. 6-11 at 113. Busby identified Costan

as the person who robbed him. *Id.*

    On November 23, around 6:45 a.m., Schierle visited the address he had

obtained for Costan. Dkt. 6-5 at 169. Costan was not home, but Kathleen Russo,

Costan's ex-girlfriend, was there. *Id.* at 170. Russo stated she had not seen Costan for a

"few weeks" but provided Costan's telephone number to the officers. *Id.* Schierle

sought and received court authorization to conduct a pen register trap and trace to track

the telephone associated with this phone number. *Id.* at 170-71. At around 6:45 p.m.

that same day, the pen register traced the phone's GPS location to the "Linden Motor

Inn" in Brooklyn. *Id.* at 171-72.

Officer Schierle went to the Linden Motor Inn with several members of the

BRS. *Id.* at 172. The front desk worker confirmed that Costan had recently checked in

and directed the officers to Costan's room. *Id.* at 172-73. The officers reviewed the

motel's surveillance video and Schierle agreed that the individual matched Costan's

description. *Id.* at 173.

The officers knocked on the door of Costan's room and identified

themselves. *Id.* Costan opened the door, and the officers immediately placed him in

handcuffs. Dkt. 6-11 at 116. The officers asked Costan whether he had any weapons.

*Id.* Costan replied that he did not have a gun, stating he threw it in a sewer and invited

the officers to search the room. *Id.* The officers searched the room and found no

weapons or other contraband. Dkt. 6-5 at 226.

The officers searched Costan's person and recovered the tracked phone

and a wallet. *Id.* at 174. The wallet contained multiple forms of identification, including

three identification cards. *Id.* at 174, 176-77. The officers determined the two of these

cards were not valid IDs. *Id.* at 178. Costan was then taken to the precinct and placed in a holding cell. *Id.* at 180.

The officers began to process the arrest at approximately 9:00 p.m. Dkt. 6-11 at 116. Schierle explained to Costan that he had been taken into custody for an investigation but did not provide any specific information about the investigation, nor did he question Costan about the robberies. Dkt. 6-5 at 214-16. Costan did not request a lawyer at this time. *Id.* at 214-15. The officers asked Costan for his name, date of birth, and current address, as well as whether he needed to eat or drink or use the restroom. Dkt. 6-11 at 116.

At 11:20 p.m., Schierle and Savino brought Costan into the lounge adjacent to the BRS office. Dkt. 6-5 at 181. The officers removed Costan's handcuffs upon entering the lounge. *Id.* at 182. Schierle read Costan his *Miranda* rights from the department form. *Id.* Costan verbally responded yes to each warning and initialed the document. *Id.* at 183, 186-88. Costan did not request an attorney or to speak with anyone. *Id.* at 183-84; 214-15. Schierle, Savino, and Costan each signed the form. *Id.* at 186-88. After the *Miranda* warnings, Costan agreed to speak with Schierle. *Id.* at 187.

Throughout the interview, the officers showed Costan still images taken from video surveillance at the various locations of the robberies. *Id.* at 188. Initially, Costan denied any involvement. Dkt. 6-5 at 188, 217. But after additional questioning

and being presented with photos and videos from the various incidents, Costan admitted to robbing several of the establishments. *Id.* at 189-90.

Costan admitted to robbing Tasti D-Lite on three occasions. *Id.* at 189. Costan also admitted to robbing two different Subway locations. *Id.* at 189-90. Costan admitted to robbing the Apple Laundry and Happy Cleaners multiple times as well. *Id.* at 190. When asked about the firearm that he used during the robberies, Costan vacillated between saying that the weapon was a "gun" and a "water gun." *Id.* at 191. Costan was apologetic toward the complainants but stated that he returned to the same places repeatedly because he needed the money. *Id.* The officers made no threats or promises to Costan. Dkt. 6-11 at 117.

Around midnight, Costan agreed to provide a written statement of his accounts. *Id.* at 117, 129. In his statement, Costan did not mention any of the robberies or the specific crimes he had committed, but he did write that "[t]he crimes I've committed are on video." Dkt. 6-9 at 10 (alteration in original). He also wrote that "there was no gun, it was a water pistol and I meant absolutely to hurt to no one." Dkt. 6-1 at 47. The officers completed the interview around 12:25 a.m. and placed Costan back in the holding cell. *Id.* at 48-49; *see also* Dkt. 6-5 at 192; Dkt. 6-11 at 117. Costan was offered food and drink as well as the opportunity to use the restroom. Dkt. 6-5 at 192.

C.     *The Lineups*

The next day, on November 24, the officers conducted the lineup identifications.  Dkt. 6-5 at 195.  Lineup fillers were secured and brought in.  *Id.* at 194, 218.  Five fillers were placed in the lineup room.  Dkt. 6-5 at 195.  Filler number one was twenty years old; filler number two was forty-eight years old; filler number three was thirty-one years old; filler number five was thirty-four years old; and filler number six was thirty-two years old.  Dkt. 6-12 at 18-19.  Costan was permitted to select his number in the lineup and selected number four.  Dkt. 6-5 at 196.

Costan and the fillers all wore white T-shirts and one of two types of baseball caps to account for differences in the fillers' hairlines.  *Id.* at 198; Dkt. 6-11 at 126.  One type of hat had "New York City" across the front, and the other had "USA" and a light-colored sticker on top of the brim.  Dkt. 6-11 at 126.  The men in seats one, three, and five wore the New York City hats, and the men in seats two, four (Costan), and six wore the USA hats.  *Id.*  Stickers were visible on the three USA hats.  *Id.*; *see also* Dkt. 6-5 at 220-21.  The sticker on Costan's hat appeared more visible because he tilted his head forward.  Dkt. 6-5 at 221-22.  The officers, however, never directed Costan to raise or lower his head when the complainants viewed the lineup.  *Id.* at 224.  Photographs of the lineup were taken prior to the viewings.  *See* Dkt. 6-11 at 126.[2]

---

[2]     The lineup photographs have not been submitted to the Court.

The complainants were placed in the BRS lounge with one another prior to viewing the lineup. Dkt. 6-5 at 200-01, 219. All the complainants were instructed not to discuss any parts of the case with each other before and after they viewed the lineup. *Id.* at 201, 204. None of the complainants requested an interpreter. *Id.* at 225. All the complainants were instructed not to discuss any part of the case with one another either before or after the lineups. *Id.* at 201.

Six employee witnesses from five different stores were brought in and asked to view the lineup. *Id.* at 201-07. The officers instructed each witness using the lineup instructions from the department form. *Id.* The witnesses then each viewed the lineup one at a time. *Id.* The lineup composition for each identification, including Costan's position in the lineup, never changed. *Id.* at 204, 207. Four out of six of the witnesses identified Costan as the person who committed the robbery. Dkt. 6-8 at 23. Two of the witnesses were unable to make any identification. Dkt. 6-5 at 19.

### D.    *Post-Lineup Interrogation*

Around 8:30 p.m., approximately four hours after the lineups concluded, Assistant District Attorney Vivian Dussek of the King's County District Attorney's Office visited the BRS to interview Costan. Dkt. 6-5 at 209. Schierle was present during Dussek's interview. *Id.* Dussek read Costan his *Miranda* rights and recorded the interview, which lasted 45 minutes. Dkt. 6-6 at 8-9. During the interview, Costan confessed to committing eleven of the twelve robberies at issue. Dkt. 6-9 at 23.

Approximately 36 minutes into his 44-minute statement, Costan stated that he was aware that he should have an attorney with and noted that this was something he had previously mentioned to a detective.  Dkt. 6-11 at 134.[3]

## II.    *The State Court Proceedings*

### A.    *Pre-Trial Proceedings*

A suppression hearing was held on May 30, 2013.  *See generally* Dkt. 6-1. Immediately before the hearing, defense counsel indicated that Costan would be proceeding *pro se* at both the suppression hearing and trial.  *Id.* at 2-3.  The court (Harrington, *J.*) urged Costan to reconsider his decision.  *Id.* at 2-5.  Costan changed his mind and agreed to give his counsel "a shot."  *Id.* at 5.  Costan's attorney, however, explained that he was unprepared, needed time to review recently turned over discovery, and was unsure as to why the hearing was being held.  *Id.*  The court agreed to adjourn only until the afternoon.  *Id.* at 6.  Costan's counsel did not put on any evidence at the suppression hearing and argued primarily that all the evidence obtained after Costan's arrest should be suppressed because the anonymous tip was insufficient to support probable cause to place his photograph in the photo array that led to his initial identification.  *Id.* at 96-98.  The court only suppressed Costan's statement about throwing the gun into the sewer.  Dkt. 6-8 at 13.  It denied the remainder of Costan's motion.  *Id.*

---

[3]    The videotaped statement is also not in the record before this Court.

**B.**    *The Trial*

Costan proceeded to a trial by jury, represented by counsel.  Dkt. 6-9 at 14-15 & n.7.  Judge Riviezzo presided at both the trial and sentencing.  Dkt. 6-2 at 2; Dkt. 6-7 at 88.  The jury heard testimony from numerous witnesses, including employees from each of the five establishments that Costan robbed.  Dkt. 6-3 at 169; Dkt. 6-4 at 4, 114; Dkt. 6-5 at 3, 43, 96.  The jury also heard from Detective Schierle.  Dkt. 6-5 at 150.  The People introduced various surveillance videos from the establishments where the robberies took place as well as stills taken from those videos.  *See e.g.*, *id.* at 35, 62; Dkt. 6-4 at 37-38; Dkt. 6-9 at 16 n.9.  Assistant District Attorney Dussek's videotaped interview of Costan was also played in full for the jury.  Dkt. 6-6 at 9.

Costan testified.  *See id.* at 12.  He denied that he was the robber described by the victims or depicted in the surveillance footage.  *Id.* at 15.  He stated that he was travelling on the dates of the robberies but had no documentation for any of his travel except for a plane ticket under a different name.  *Id.* at 16.  He also claimed that he had no motive to commit the robberies because he had money from other sources, including several checks for various businesses that he claimed to own.  *Id.* at 13-14, 27.  On cross-examination, however, he was presented with a letter from the U.S. Postal Service stating that one of the checks in his possession, a check for $63,800, had been stolen from a mail carrier within the same time period as the robberies.  *Id.* at 46-47.  Costan testified that he requested a lawyer when the officers entered his motel room and

11

requested a lawyer again at the precinct.  Dkt. 6-6 at 19-20, 24-27.  He also stated that

Detective Schierle punched him and coached his videotaped statement.  *Id.*  Costan

moved to dismiss the charges, arguing that there was insufficient evidence to establish

first-degree robbery for two of the incidents.  *See* Dkt. 6-7 at 138-39.  The court denied

the motion.  *Id.*  The jury unanimously convicted Costan on each charged incident.  *Id.*

at 118-24.

   At sentencing, on March 25, 2014, the court acknowledged Costan's four

prior non-violent felony convictions, four prior misdemeanor convictions, and two

pending indictments for criminal contempt and assault in a separate case.  Dkt. 6-9 at

28-29; Dkt. 6-7 at 146.  The court concluded that Costan's testimony was "completely

untrue," his "alibi defense had no support in the evidence and no foundation in the

facts," and the evidence of guilt was "truly overwhelming."  Dkt. 6-7 at 147.  The court

also found that Costan "fail[ed] to show remorse and acknowledge his guilt."  *Id.*  The

court also noted that "defendant's actions have had a profound and long-lasting effect

on the victims" who were "hard-working" "immigrants trying to make an honest living,

working towards the American dream."  *Id.* at 148.  The People sought an aggregate

sentence of 240 years.  Dkt. 6-9 at 29.  The court, however, sentenced Costan to an

aggregate term of 68 years.  *Id.* at 32; Dkt. 6-7 at 149-51.

C.    *Direct Appeal*

In March 2018, Costan filed an appeal in the Appellate Division, Second Department, arguing that he was denied effective assistance of counsel at his pretrial suppression hearing. Dkt. 6-8. The Appellate Division agreed and held the appeal in abeyance while remitting the matter for a *de novo* suppression hearing. *People v. Costan*, 94 N.Y.S.3d 131, 133-34 (2d Dep't 2019) ("*Costan I*"). On July 17, 23, and September 10, 2019, the *de novo* hearing was conducted. Dkt. 6-11 at 111. The hearing court (Cyrulnik, J.) issued its written decision on December 3, 2019. *See generally id.* at 111-36. It found the People's witnesses credible and that all the evidence was admissible apart from Costan's statement about discarding the gun. *Id.* at 112, 129.

Following the court's order, Costan and the People both filed supplemental briefing with the Appellate Division. Dkt. 6-10; 6-12. In a written opinion, it rejected most of Costan's claims on the merits. *Costan II*, 152 N.Y.S.3d at 168-71. The court held that the Supreme Court's decision in *Carpenter v. United States*, 585 U.S. 296 (2018), only applied to historical cell site location information ("CLSI"), not the real-time CLSI that was at issue here. *Costan II*, 152 N.Y.S.3d at 168. It also reasoned that even if *Carpenter* applied, the pen register trap and trace order was effectively a warrant for *Carpenter* purposes because it contained an "express finding of probable cause, which was supported by the People's evidentiary showing." *Id.* (quoting *People v. Grant*, 127 N.Y.S.3d 120, 122 (2d Dep't 2020)). The court also found that Costan

13

"knowingly and voluntarily waived his *Miranda* rights," and that there was no evidence that the delay between his arrest and his statement was strategically designed to deprive Costan of his right to counsel or obtain a forced confession. *Id.* at 169. The court also held that the lineups were not unduly suggestive, explaining that "the lineup fillers were reasonably similar in appearance to the defendant and that the police took reasonable steps to conceal any differences." *Id.*

The Appellate Division held, however, that one of Costan's first-degree robbery convictions was not supported by the evidence, *id.* at 170 (observing that the People failed to adduce evidence that Costan displayed what appeared to be a gun during one of the robberies), and that the contents of Costan's wallet should have been suppressed because the wallet was "improperly searched at the time of arrest," *id.* Accordingly, the Appellate Division modified the judgment of conviction. It reduced one of the first-degree robbery convictions to robbery in the third degree; vacated the two convictions of criminal possession of a forged instrument; remitted the matter for re-sentencing on the new third-degree robbery conviction; and reduced Costan's sentence "in the interests of justice" to an aggregate term of twenty-four years. *Id.* at 170-71. The Court of Appeals denied Costan's application for leave to appeal. *Costan III*, 37 N.Y.3d at 433. On remand, Costan was resentenced by the Kings County Supreme Court on the new third-degree robbery conviction to a concurrent term of two to four years' imprisonment. *See* Dkt. 33 at 6.

**III.    *The Petition and State Collateral Review***

By papers dated October 27, 2022, and received by this Court on January 3, 2023, Costan filed, *pro se*, the Petition pursuant to 28 U.S.C. § 2254.  Dkt. 1.  The People filed their opposition on March 31, 2023.  Dkt. 6.  While the Petition was pending in this Court, Costan filed a motion in the Kings County Supreme Court to vacate the judgment and set aside the sentence pursuant to CPL §§ 440.10 and 440.20.  *See* Dkt. 33.  In his section 440 motion, Costan argued that (1) he was improperly adjudicated a predicate felon, (2) the consecutive sentences on counts 1 and 24 were not authorized, and (3) his sentence is excessive.  *See id.*

On August 29, 2023, this Court ordered the Petition to be held in abeyance while his section 440 motion was pending in state court.  Dkt. 15.  On April 22, 2024, the state court (Chu, *J.*) issued a written order denying all of Costan's claims.  *See* Dkt. 33.  The People mailed a copy of that decision to Costan on July 10, 2024.  *See id.*  Costan did not file a leave application with the Appellate Division.

On August 19, 2024, once the 30-day window for the appeal of the denial of the section 440 motion had expired and no appeal had been taken, *see* N.Y. C.P.L. § 460.10(4)(a) (requiring filing of appeal within 30 days after service of denial of section 440 motion), this Court lifted the abeyance.  *See* Aug. 19, 2024 Minute Order.  The Court also denied Costan's request to appoint counsel but gave Costan leave to file additional documents in response to Respondent's opposition by September 30, 2024.  *Id.*  On

August 21, 2024, Costan made a second request for the appointment of counsel, which

remains pending.  Dkt. 40.  The case was reassigned to the undersigned on September

18, 2024.  *See* Sept. 18, 2024 Minute Order.  Costan submitted a letter dated September

24, 2024 with additional responses to Respondent's opposition.  Dkt. 42.[4]  Costan has

filed two requests for a hearing on his petition.  *See* Dkts. 46; 50.

## *DISCUSSION*

**I.    *Federal Review of State Convictions***

As a threshold matter, a federal court may not grant a habeas petition

where the petitioner is in custody pursuant to a judgment of a state court unless the

petitioner "has exhausted the remedies available in the courts of the State" or such

process is unavailable or ineffective.  28 U.S.C. § 2254(b)(1)(A); *see id.* § 2254(b)(1)(B);

*Jackson v. Conway*, 763.F.3d 115, 133 (2d Cir. 2014) ("[A] state prisoner is required to

exhaust all of his available state remedies before a federal court can consider his habeas

application.").

Moreover, "federal courts will not review questions of federal law

presented in a habeas petition when the state court's decision rests upon a state-law

ground that is independent of the federal question and adequate to support the

judgment."  *Cone v. Bell*, 556 U.S. 449, 465 (2009) (internal quotation marks omitted).

---

[4]    Costan also submitted six additional letters, post marked after September 30, 2024, which contain copies of additional case law and other miscellaneous arguments regarding the Petition.  Dkts. 42, 43, 44, 45, 47, 48, 49.

That is, federal courts may not review a state court ruling that "fairly appear[s] to rest primarily on state procedural law," so long as the procedural bar is "adequate to support the judgment." *Murden v. Artuz*, 497 F.3d 178, 191-92 (2d Cir. 2007) (alteration in original) (internal quotation marks omitted). Federal courts in this Circuit have repeatedly held that the gatekeeping provisions of New York laws governing a petitioner's failure to raise a claim on direct appeal "represent[] the application of a 'firmly established and regularly followed' New York rule." *Williams v. Goord*, 277 F. Supp. 2d 309, 318-19 (S.D.N.Y. 2003) (quoting *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)).

Where a petitioner's claim was adjudicated on the merits in state court, a federal court may not grant a habeas petition with regard to that claim unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97-98 (2011); *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017). Hence, when state court adjudicates a claim on the merits, that decision must be accorded "substantial deference." *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015). "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded

disagreement.'" *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (alterations in original) (quoting *Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per curiam).

With respect to claims under the Fourth Amendment, "where the State has provided an opportunity for full and fair litigation of . . . [the] claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 482 (1976). Thus, a petitioner may obtain habeas relief arising from Fourth Amendment claims only if he establishes either that "'the state has provided no corrective procedures at all to redress the alleged fourth amendment violations,' or, 'if the state has provided a corrective mechanism,' that the petitioner 'was precluded from using that mechanism because of an unconscionable breakdown in the underlying process.'" *Ethridge v. Bell*, 49 F.4th 674, 684 (2d Cir. 2022) (quoting *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992)). To establish such a breakdown, the petitioner must prove that the state system "failed to conduct a reasoned method of inquiry into relevant questions of fact and law." *Capellan*, 975 F.2d at 71 (internal quotation marks omitted).

## II.    *Analysis*

I liberally construe the Petition as raising four grounds for relief:

(1) Costan's Fourth Amendment rights were violated because the People accessed his

18

real-time CSLI data and entered his motel room without a warrant; (2) his Fifth

Amendment rights were violated due to the delay between his arrest and arraignment;

(3) his Sixth Amendment right to counsel was violated when the officers allegedly failed

to halt questioning after Costan purportedly indicated that he wanted to speak with

counsel; and (4) his due process rights were violated due to the lack of interpreters

during the lineup identifications. *See generally* Dkt. 1. I address each claim in turn.

### A.    *Fourth Amendment Claims*

Costan first asserts that his Fourth Amendment rights were violated when

the police obtained his real-time CSLI and entered his motel room without a warrant.

*Id.* at 5, 11 (Ground One, Ground Four). Habeas relief, however, is unavailable for

purported Fourth Amendment violations where, as here, the state courts have provided

the petitioner with a full and fair opportunity to litigate his claims. *See Stone*, 428 U.S. at

482; *see also Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002) ("[O]nce it is established

that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim

(whether or not he or she took advantage of the state's procedure), the court's denial of

the claim is a conclusive determination that the claim will never present a valid basis for

federal habeas relief.").

As noted, federal review of Fourth Amendment claims in habeas petitions

may only be undertaken in two instances, neither of which Costan has shown to be

applicable here. *See Capellan*, 975 F.2d at 70. Costan has not shown that "the state has

provided no corrective procedures at all to redress the alleged fourth amendment violations." *Ethridge*, 49 F.4th at 684 (quoting *Capellan*, 975 F.2d at 70). To the contrary, the Second Circuit has long held that New York's procedure for litigating Fourth Amendment claims is facially adequate. *See Capellan*, 975 F.2d at 70 n.1 (collecting cases); *Daily v. New York*, 388 F. Supp. 2d 238, 249 (S.D.N.Y. 2005) ("The State of New York clearly has provided defendants . . . with the necessary corrective procedures through Section 710 of the New York Criminal Procedure Law."). Therefore, as New York has provided a "corrective mechanism," Costan may only obtain habeas relief if he can establish that he was "precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Ethridge*, 49 F.4th at 684 (quoting *Capellan*, 975 F.2d at 70).

To establish an unconscionable breakdown, Costan would have to show that the trial court and the Appellate Division "failed to conduct a reasoned method of inquiry into relevant questions of fact and law," *Hicks v. Bellnier*, 43 F. Supp. 3d 214, 231 (E.D.N.Y. 2014) (quoting *Capellan*, 975 F.2d at 71), which is a "stringent standard," *Clanton v. LaClair*, No. 14-CV-4551, 2015 WL 13832649, at *11 (S.D.N.Y. Nov. 4, 2015), *report and recommendation adopted*, 2019 WL 4688725 (S.D.N.Y. Sept. 25, 2019); *see also Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y.) ("In short an unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at

the heart of a civilized society."), *aff'd*, 852 F.2d 59 (2d Cir. 1988).  Costan has made no

such showing here.

Costan filed a counseled brief in the Appellate Division that included his

Fourth Amendment claim, arguing that he was denied effective assistance of counsel at

his pretrial suppression hearing when the court denied an adjournment to give Costan's

attorney more time to prepare.  *See* Dkt. 6-8.  The Appellate Division agreed that the

district court abused its discretion in denying a longer adjournment, and that Costan

had received ineffective assistance at his suppression hearing as a result.  *Costan I*, 94

N.Y.S.3d at 133-34.  The Appellate Division then remitted the matter for a new

suppression hearing.  *Id.*  On remittance, the court held three days of evidentiary

hearings and issued a report that included findings of fact and conclusions of law in

support of its determination.  The court concluded that all the evidence was admissible

except for Costan's statement that "he had thrown his gun into the sewer," as he had not

been *Mirandized* when he made the statement.  *See* Dkt. 6-11 at 111-126.

After the hearing court issued its order, Costan filed a counseled

supplemental brief to the Appellate Division.  Dkt. 6-8.  The Appellate Division

reviewed and rejected both of the Fourth Amendment claims that Costan now raises in

the Petition -- those related to the CSLI data and motel room entry -- on the merits.

*Costan II*, 152 N.Y.S.3d at 165-66.  Costan filed a counseled leave application to the Court

of Appeals on these specific issues, which the Court of Appeals denied.  Dkts. 6-13, 6-14;

*Costan III*, 37 N.Y.3d at 433.  There was no failure here "to conduct a reasoned method of inquiry into relevant questions of fact and law." *Hicks*, 43 F. Supp. 3d at 231 (quoting *Capellan*, 975 F.2d at 71).  Costan's "mere disagreement with the outcome of [the] state court ruling is not the equivalent of an unconscionable breakdown." *Capellan*, 975 F.2d at 72.  Costan is not entitled to relief on this claim.

### B.    *Delay Between Arrest and Arraignment*

Costan next claims that he was unlawfully detained for two days prior to his arraignment, and this delay was intentional and designed to obtain a forced confession.  Dkt. 1 at 8-9 (Ground 3).  "To the extent that federal habeas courts have even considered the constitutionality of delaying arraignment of state defendants, they have only done so as part of a Fifth Amendment based analysis of the voluntariness of confessions." *Holmes v. Scully*, 706 F. Supp. 195, 202 (E.D.N.Y. 1989).  Accordingly, a "delay in arraigning a state defendant is not, in itself, a constitutional violation, but is at most a factor to be weighed in determining whether or not, viewed in the totality of the circumstances, an incriminating statement was the product of police coercion." *Id.* (footnote omitted); *accord Festus v. Noeth*, No. 17-CV-3941 (JMA), 2020 WL 7042666, at *12-13 (E.D.N.Y. Nov. 30, 2020) (same); *United States ex rel. Wade v. Jackson*, 256 F.2d 7 (2d Cir. 1958) ("[F]ailure to arraign without unnecessary delay, even though it constitutes a violation of the state code is only one factor to be considered in the

22

determination of whether a confession is involuntary."). Therefore, I only address

whether the delay in Costan's arraignment rendered his *Miranda* waiver involuntary.

In analyzing the voluntariness of a confession, the court must consider

"the totality of all the surrounding circumstances -- both the characteristics of the

accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434

(2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The Appellate

Division rejected Costan's claim, finding that "the suppression hearing evidence

established that the defendant knowingly and voluntarily waived his *Miranda* rights"

and Costan's "contention that an undue delay in his arraignment warranted

suppression of his videotaped statement [was] without merit." *Costan II*, 152 N.Y.S.3d

at 169. The court specifically noted that "[t]here was no evidence presented at the

hearing that any purported delay was 'for the purpose of depriving the defendant of the

right to counsel and obtaining an involuntary confession, and that this delay was

strategically designed so that an accused could be questioned outside the presence of

counsel.'" *Id.* (quoting *People v. Blount*, 112 N.Y.S.3d 115 (2d Dep't 2019)).

This decision is entitled to "substantial deference," *Fischer*, 780 F.3d at 560,

and is not unreasonable because the hearing evidence established that Costan's

confessions and *Miranda* waivers were voluntary. First, it is undisputed that, apart

from Costan's spontaneous statement to Schierle during booking, the officers read

Costan his *Miranda* rights, and Costan memorialized his waivers in writing prior to making each of his statements.  *See* Dkt. 6-11 at 129-31.

Moreover, all of Costan's statements -- apart from the videotaped statement made to Assistant District Attorney Dussek the following day -- were made within the first several hours of his arrival at the BRS.  Costan was transported to the precinct at approximately 9:00 p.m. on November 23, 2012.  While Detective Schierle began collecting Costan's pedigree information, Costan spontaneously "stated . . . that he knew he was going to do time for this and he couldn't do another bit."  Dkt. 6-1 at 31. At approximately 11:20 p.m., Costan was moved from a holding cell to a lounge area where he was read his *Miranda* rights, interrogated, and admitted to committing several of the robberies.  *Id.* at 32-48.  Just after midnight, Costan gave a written statement in which he acknowledged that "[t]he crimes I've committed are on video."  *Id.* at 46-48. The last challenged statement that Costan made to Assistant District Attorney Dussek occurred at approximately 8:30 p.m. the next day.

Finally, there is no evidence that the delay in Costan's arraignment was designed to obtain a forced confession.  To the contrary, the state hearing court found that the "police acted with diligence in completing the investigation," and that the delay was due in part to the preparations involved in bringing in six complaining witnesses to view the lineups in a complex case involving a dozen separate robberies.  Dkt. 6-11 at 131.  On federal habeas review, the state hearing court's express and implied findings of

fact, including findings of credibility, regarding the circumstances surrounding Costan's statements to the police are presumptively correct unless defeated by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *accord Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012); *Reyes v. Greiner*, 340 F. Supp. 2d 245, 256-57 (E.D.N.Y. 2004), *aff'd*, 150 F. App'x 77 (2d Cir. 2005). Nothing in the record suggests that this factual finding was in error. Accordingly, Costan is not entitled to relief on this claim either.

### C.    *Invocation of the Right to Counsel*

Costan asserts that his Sixth Amendment right to counsel was violated because "during police interrogation [he] stated that he should have had an attorney present" and "was not allowed to call anyone for two days of unlawful detention in the police precinct." Dkt. 1 at 7 (Ground Two). Relatedly, he states that he "alluded to wanting an attorney present" and that he was denied the ability to call counsel to assist him during the lineup identification procedures. *Id.* at 8-9 (Ground Three). Costan raised a similar claim during the suppression proceedings, which was rejected by the hearing court. *See* Dkt. 6-11 at 132. He failed, however, to raise this issue on direct appeal to either the Appellate Division or Court of Appeals. *See* Dkt. 6-10; Dkt. 6-14. Instead, he limited his Fifth and Sixth Amendment claims solely to the delay in his arraignment. *See* Dkt. 6-10 at 36-38. Accordingly, this claim is procedurally defaulted.

A federal habeas court may not review the merits of a procedurally defaulted claim, unless the petitioner demonstrates (1) "cause for the default and actual

prejudice," or (2) "that failure to consider the claims will result in a fundamental

miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To establish

"cause" for a procedural default, the petitioner must ordinarily show that "some

objective factor external to the defense impeded [his] efforts to comply with the State's

procedural rule" in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *accord Clark v.

Perez*, 510 F.3d 382, 393 (2d Cir. 2008). To establish "actual prejudice," a petitioner must

show that "errors at his trial . . . worked to his *actual* and substantial disadvantage,

infecting his entire trial with error of constitutional dimensions." *United States v. Frady*,

456 U.S. 152, 170 (1982). Finally, to show a "fundamental miscarriage of justice," a

petitioner must show that "a constitutional violation has probably resulted in the

conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

Costan has not met any of the exceptions that would permit the Court's

review of his procedurally defaulted claim. He has not presented any facts showing

that there was cause for the procedural default. Furthermore, he can show neither

actual prejudice nor a fundamental miscarriage of justice as the hearing evidence failed

to establish that Costan unequivocally invoked his right to counsel.

"For a suspect to invoke his *Miranda* right to counsel, he must at a

minimum make 'some statement that can reasonably be construed to be an expression

of a desire for the assistance of an attorney *in dealing with custodial interrogation*.'" *United

States v. Oehne,* 698 F.3d 119, 122–23 (2d Cir. 2012) (per curiam) (quoting *McNeil v.*

*Wisconsin*, 501 U.S. 171, 178 (1991)).  "If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights."  *Id.* (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)).  Bare references to counsel are insufficient.  *Id.* (finding that suspects statement to officers that he had a lawyer was "insufficient to constitute an unambiguous request for counsel"); *see also Davis v. United States*, 512 U.S. 452, 462 (1994) ("Maybe I should talk to a lawyer" deemed insufficient); *Diaz v. Senkowski*, 76 F.3d 61, 63-66 (2d Cir.1996) ("Do you think I need a lawyer?" deemed insufficient); *United States v. Scarpa*, 897 F.2d 63, 68-70 (2d Cir. 1990) (statement that suspect "was going to get a lawyer" deemed insufficient).

The state hearing court found that "the evidence does not establish that defendant unequivocally invoked his right to counsel at any time while he was in police custody."  Dkt. 6-11 at 133.  Inspector Savino and Detective Schierle consistently maintained, even after being confronted with Costan's videotaped statement, that Costan never requested a lawyer or even mentioned an attorney prior to the videotaped interview with Assistant District Attorney Dussek on November 24.  *Id.* at 135.  The hearing court found the law enforcement officers to be credible, while concluding that all of Costan's statements were "consistently self-serving" and could be construed as "attempts to manipulate."  *Id.*  Costan has failed to provide any evidence, much less

clear and convincing evidence, that would suggest the state hearing court's factual findings and credibility determinations should be rejected.  *See Epps*, 687 F.3d at 50.

The court also concluded that Costan's passing reference to an attorney in his videotaped interview could not be reasonably understood as an unequivocal invocation of his right to counsel either.  In the interview, Costan remarked that he was aware he should have an attorney and claims that this was something he had mentioned to the detective earlier.[5]  The hearing court found that these words "amount[ed] to nothing more than an acknowledgement that he understood his right to have an attorney present while being questioned."  Dkt. 6-11 at 134-35.  The court explained that Costan's demeanor throughout the videotaped statement was "calm, relaxed, polite, cooperative and . . . friendly," and that Costan "appeared quite eager to commence the interview, asking several times if he could make a statement before *Miranda* warnings were administered and interrupting the *Miranda* warnings more than once, seeking to speak."  *Id.* at 134.  The court also observed that Costan did not specifically request an attorney at any point during the videotaped statement.  *Id.*  Costan also did not suggest that he wanted to stop the interview or questioning.  *Id.*  Instead, "upon acknowledging [that] he was entitled to an attorney, defendant

---

[5]      As the hearing court observed: "[a]pproximately 36 minutes into his 44 minute statement, defendant expressed that he wished to forget his actions and, lamenting the criminal prosecution facing him, stated that he was aware that he should have an attorney, which, he claimed, was something he had previously mentioned to a detective."  Dkt. 6-11 at 134.

reassured the Assistant District Attorney that he was speaking to her willingly and wished to continue." *Id.* Costan does not point to any evidence that would indicate that these factual findings are incorrect.

Costan's claim is thus procedurally defaulted, and in any event, the state hearing court's conclusion was not an unreasonable application of *Davis*, nor an unreasonable determination of the facts in any event. Accordingly, this claim fails.

**D.    *The Lineup Identifications***

Costan contends that the lineup identifications violated his due process rights as there was no translator present during the lineup for non-English-speaking complaining witnesses. Dkt. 1 at 8-9 (Ground 3). Respondent argues that this claim is unexhausted, and therefore procedurally defaulted, because he "failed to raise this factual allegation as part of his suggestiveness claim on appeal." Dkt. 6 at 20 n.2.[6]

Whether this claim is procedurally defaulted is a close call. Costan raised the issue of interpreters as a factual basis for his suggestiveness claim, albeit in one sentence, in his brief to the Appellate Division, *see* Dkt. 6-10 at 41 ("Schierle's failure, moreover, to use an interpreter when instructing the witnesses even though they needed one at trial further exacerbated the procedure's unfairness."), and referred to the

---

[6]    Costan's challenge to the lineup procedures focused almost entirely on the purported dissimilarities between Costan and the fillers as well as the piece of tape on the baseball cap that Costan wore, which allegedly created an improper visual cue. Dkt. 6-10 at 39-42; 6-14 at 10-11. Costan does not renew this specific factual basis regarding the appearance of the fillers in his habeas petition, and therefore I do not address this aspect of his prior claim. *See generally* Dkt. 1.

suggestiveness claim in his leave application to the New York Court of Appeals as well, *see* Dkt. 6-14 at 10-11. Although Costan did not mention the lack of interpreters in his leave application, he noted that the suggestiveness claim was based on several "factors" and cited the pages of his Appellate Division Brief that referenced this issue. *Id.*

In any event, Costan's claim is without merit. "The Supreme Court has established a two-step inquiry for evaluating the constitutional permissibility of in-court identification testimony based on out-of-court identification procedures." *United States v. Wong*, 40 F.3d 1347, 1359 (2d Cir. 1994). First, the court must determine whether the pretrial identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *accord Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). If the pretrial identification procedure was not suggestive, the identification evidence presents no due process obstacle to admissibility, and no further inquiry by the court is required. *Raheem*, 257 F.3d at 133.

If the proceedings are found to be suggestive, the court then "must then determine whether the identification was nonetheless independently reliable." *Raheem*, 257 F.3d at 133. To determine the reliability of an in-court identification, the court looks to the totality of the circumstances, *see United States v. Tortora*, 30 F.3d 334, 338 (2d Cir. 1994), and may consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the

criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation," *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

The state hearing court specifically addressed Costan's contention regarding the translators, and found:

> The court also rejects as meritless the defendant's further suggestion that the failure to employ interpreters for the complaining witnesses viewing the lineup was fatal. That the witnesses ultimately testified in court with the use of an interpreter is not proof that they were unable to communicate in English. There is nothing in the record to support defendant's speculative conclusion that the witnesses could not have understood the instructions they received from Detective Schierle.

Dkt. 6-11 at 127.

These factual findings of the state hearing court are presumptively correct until defeated by clear and convincing evidence. As the state court noted, the only evidence that Costan presented is the fact that the witnesses testified through an interpreter at trial. But this fact alone is insufficient to show that the complaining witnesses could not understand the lineup identification instructions. Costan's claim regarding the lack of interpreters during the lineups therefore fails.

E. *Other Unexhausted Claims*

Costan appears to raise additional grounds for relief in subsequent letters to the court, including that (1) he was improperly sentenced to consecutive prison terms, (2) there was no probable cause for his arrest, and (3) the pen register and trap order was only provided to him after his suppression hearing. *See, e.g.*, Dkts. 8, 9, 38.

I decline to address these claims because Costan failed to raise these contentions on direct state appeal, and Costan has not shown cause or actual prejudice; nor he has he demonstrated a fundamental miscarriage of justice.

As the hearing court concluded, the officers had probable cause for the arrest based on the anonymous tip identifying Costan as the perpetrator of the robberies and Damarr Busby's identification of Costan in the photo array.  Dkt. 6-11 at 121-22.  Further, while it is true that the officers did not have a copy of the pen register trap and trace order when they testified at the de novo suppression hearing, *see* Dkt. 6-10 at 16 n.5, Costan consented to the introduction of the order into evidence prior to the hearing court's decision and still challenged the order under the Fourth Amendment in his post-hearing opening and reply briefs.  *Id.* at 10-12; Dkt. 6-11 at 2-6.  Finally, "[w]hether a sentence should run concurrently or consecutively is purely an issue of state law and is not cognizable on federal habeas review."  *Brahney v. Conveny*, 537 F. Supp. 3d 457, 466 (W.D.N.Y. 2021) (quoting *Johnson v. New York*, 851 F. Supp. 2d 713, 722 (S.D.N.Y. 2012)).  Moreover, it is well established that "[a]n excessive sentence claim may not provide grounds for habeas corpus relief where a petitioner's sentence is within the range prescribed by state law."  *Bey v. Chappius*, No. 16-cv-7084 (KAM), 2019 WL 4805401, at *22 (E.D.N.Y. Sept. 30, 2019).  There is no indication that Costan's 24-year sentence, reduced by the Appellate Division "in the interest of justice," *Costan II*, 152 N.Y.S.3d at 170, was not within the range prescribed by state law.

**F.    *Requests for a Hearing and Counsel***

I deny Costan's request for a hearing and request for appointment of counsel in these proceedings.  To the extent Costan claims that there are disputed issues of fact, I find that this assertion is refuted by the record.  *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").  As there will be no hearing, I also find that there is no need to appoint counsel.  *See Harris v. United States*, 367 F.3d 74, 81 (2d Cir. 2004) (holding that there is no constitutional right to counsel in civil habeas proceedings); *Moolenaar v. Mantella*, No. 00-cv-6380, 2001 WL 43602, at *1 (S.D.N.Y. Jan. 18, 2001) (observing that "[w]here no hearing is to be held, the appointment of counsel is not warranted").

## CONCLUSION

Costan has failed to show any basis for relief under 28 U.S.C. § 2254.  Accordingly, the Petition is denied.  Additionally, I decline to issue a certificate of appealability because Costan has not made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c)(2).  Pursuant to 28 U.S.C. § 1915(a)(3), I certify that any appeal taken from this decision and order would not be taken in good faith.  I also deny Costan's request for a hearing as well as Costan's request for the appointment of counsel.

The Clerk of the Court shall enter judgment accordingly and shall also mail copies of this memorandum decision and the judgment to Costan at his address of record.

SO ORDERED.

Dated:      New York, New York
            March 24, 2025

_____
DENNY CHIN
United States Circuit Judge
Sitting by Designation